| STATE OF MARYLAND | * | IN THE |
| --- | --- | --- |
| v. | * | CIRCUIT COURT |
| KEVIN A. SOPER | * | FOR |
| Defendant | * | CECIL COUNTY |
| | * | CASE NUMBER: C-07-CR-23-000258 |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION TO DISMISS

Now comes Defendant, Kevin A. Soper, by and through his attorneys, Tyler J. Nowicki, Esq. and Nowicki & Associates, P.A., hereby files this Motion to Dismiss pursuant to Maryland Rule 4-252(d) and in support thereof states:

### I. *PREAMBLE*

The charges against Mr. Soper should be dismissed, because the incident for which Mr. Soper is charged occurring on or about January 31st, 2023 at the Perry Point Veteran's Affairs Medical Center (hereinafter "VA") located at 361 Boiler House Road, Perry Point, MD 21902, Building 361, occurred on land which is under the exclusive jurisdiction of the United States Government; thus, the charging document fails to show jurisdiction in this Honorable Court, and Mr. Soper is not subject to the State of Maryland charges now before this Honorable Court as prosecuted by the Office of the State's Attorney for Cecil County, Maryland.

### II. *STATEMENT OF FACTS*

Mr. Soper was attending a medical appointment on the date in question when his treating physician, Dr. Anuraag Sood, M.D. became frustrated with Mr. Soper for allegedly not properly wearing his mask, although wearing a mask, during his patient visit despite his verified medical

1

documentation of breathing issues and refused to treat or continue with Mr. Soper's medical appointment. It is alleged that Mr. Soper then video and/or audio taped portions of his medical visit and interaction on this date with VA employees while on VA property and displayed or otherwise caused to be distributed to his YouTube page titled "The Angry Vet." Department of Veterans Affairs Police, Officer Dale A. Money responded to the location, Building 361, Room 124 and charged Mr. Soper due to "the patient was recording the doctor without their knowledge or consent." Further, Officer Money's report states: "I contacted the Assistant United States Attorney (AUSA) and left a message. The AUSA has not returned my call. Charges are pending for violating Maryland's Wiretapping and Electronic Surveillance Act which requires all parties involved to provide consent prior to any audio recording."[1] From this incident Mr. Soper now faces three (3) charges as codified by Maryland Courts & Judicial Proceedings, Code Ann., § 10-402 and one (1) charge as codified by Maryland Criminal Law, Code Ann., § 10-201(c)(2).

III. *ARGUMENT*

A. The Incident Occurred on a Federal Enclave

This Honorable Court lacks jurisdiction to hear this matter as presently charged based upon the Federal Enclave status, and thus exclusive federal jurisdiction, of the land and property of the incident at all times, namely the Veteran's Administration (VA) land and property located at Perry Point, MD. The VA has a rich and colorful history. Around 1680, Lord Baltimore made grant of 32,000 acres of land to his cousin Geroge Talbot, which encompassed "Susquehanna Point" or, Perry Point, MD. John Bateman acquired the land in 1658 by a patent from Lord Baltimore. In 1710, Captain Richard Perry acquired the land. In 1729, Phillip Thomas became owner of the Property, whose family owned the land until it's

---

[1] Find attached hereto as Exhibit A said Incident Report from the Department of Veterans Affairs Police.

sale to John Stump in 1800. The Stump family owned the property until 1861, when during the Civil War, the United States Government took over the property. In 1918, despite the property being already taken over by the United States Government, the United States Government "purchased" the land consisting of 516 acres at issue from the Stump family for $150,000.00. By an act of Congress, Perry Point was "turned over" to the U.S. Public Health Service on March 3rd, 1919. On or about May 1st, 1922, the United States Veterans Bureau "took over" Perry Point, MD. When the United States Veterans Bureau was created in 1922, Perry Point was placed under its administration on May 1, 1922. Thereafter, the Veterans Administration was established by the Executive Order of President Herbert Hoover in 1930. The Veteran's Administration was then elevated to cabinet level Executive Department by President Ronald Reagan in October 1988l and the Veterans Administration was renamed the Department of Veterans Affairs, and has continued to be better known as the "VA" to present date.[2]

Thus, it is absolute that the land and property at issue has never, since 1918 (arguably since 1861), been transferred out of Federal control. The property, by this act of Congress, is to be forever held under The Enclave Clause, found at Article I, Section 8, Clause 17 of the United States Constitution, which grants the United States exclusive legislative jurisdiction over any parcel of land ceded by a state to the federal government "for the Erection of Forts, Magazines, Arsenals, Dock, Yards, and other Needful Buildings." *Id*. The United States Supreme Court has interpreted this clause to mean that state laws passed after the date upon which the parcel was ceded by the State to the Federal Government, do not apply within the enclave, unless the state specifically retained jurisdiction over the subject matter at issue.

---

[2] Find attached hereto as Exhibit B the VA's produced "The History of the Perry Point Peninsula: From Early Settlers to VA Health Care for Veterans.

After exclusive jurisdiction over lands within a state has been ceded to the United States, Congress alone has the power to punish crimes committed within the ceded territory. *Battle v. United States*, 209 U.S. 36 (1908); *Johnson v. Yellow Cab Co.*, 321 U.S. 383 (1944); *Bowen v. Johnston*, 306 U.S. 19 (1939).

The fact the VA is a federal enclave subject to exclusive federal jurisdiction was unequivocally verified by the Maryland Court of Appeals in *Royer v. Board of Election Supervisors*, 231 Md. 561 (1963). In *Royer*, the matter was an appeal from an order dismissing a petition for appeal praying an order requiring the Board of Election Supervisors of Cecil County to register the petitioners as qualified voters in Cecil County. The salient facts were stipulated. The petitioners were civilian employees of the United States Government at the Perry Point Veterans' Hospital, located within the geographical limits of Cecil County, and reside and work there, having no other residence in the County. The Court stated: "The tract known as Perry Point, consisting of about five hundred acres of land, was purchased by the United States Government in 1918 and used to manufacture chemicals for war purposes. A manufacturing plant was erected thereon and a number of workers' houses and facilities. It now contains, in addition, hospitals for the care and treatment of disabled veterans, operated by the Veterans' Administration. The tract was purchased in strict accordance with the provisions of the Federal Constitution, for the purposes mentioned in Article I, sec. 8, clause 17, and with the consent of the State of Maryland. Exclusive jurisdiction was ceded by the State, in accordance with the provisions of Chapter 743 of the Acts of 1906, now codified as Code (1957), Art. 96, secs. 31, 36 and 37. The *only* reservation by the State was the right to serve civil and criminal process

upon persons found there. The state expressly agreed that the land ceded should be exempt "from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State." (*Emphasis Added*) *Id.* at 563.[3]

After establishing that the VA is a federal enclave, the next question that must be answered is: which state laws are preempted? The general rule is that: (1) a state law that was enacted before the cession continues to apply unless Congress states otherwise; and (2) state law that was enacted after the creation of the enclave does not apply to the enclave.

It was not until 1956 that the Maryland General Assembly passed the Maryland Wiretapping Act to establish such applicable statutory guidelines. Wiretapping Act, ch.116, 1956 Md. Laws 294 (repealed and recodified in 1973). What is now codified as Maryland Courts & Judicial Proceedings, Code Ann., § 10-402 – the charge Mr. Soper currently faces, began as An. Code 1957, art. 35, §§ 93, 99; 1973. It was during the Maryland General Assembly's 1973 Special Session that the Courts & Judicial Proceedings Article was enacted. Act of August 22, 1973, ch. 2, 1973 Md. Laws Spec. Sess. 4. Thus, the state law at issue was enacted after the creation of the enclave and does not apply to the enclave.

Similarly, the earliest codified statute of Disorderly Conduct is found in Flack's Md. Ann. Code, 1939 (1947 Cum.Supp.), art. 27, § 131. See *Niemotko v. Maryland*, 340 U.S. 268 (1951). Thus, the state law at issue was enacted after the creation of the enclave and does not apply to the enclave.

There are three (3) notable exceptions to this general rule. First, state law is not preempted if the state had, at the time of cession, expressly reserved the right to legislate over

---

[3] *Royer* case attached hereto in its entirety as Exhibit C.

5

the matters at issue. As noted in *Royer*, the state did not reserve the right to legislate over the matter at issue, criminal charges. Second, minor regulatory changes to state programs that existed at the time of cession are not preempted "provided the basic state law authorizing such control has been in effect" since the time of cession. That is not the case in the instant matter. Finally, federal enclaves are not shielded from state law if Congress provides "clear and unambiguous" authorization for such state regulation over its federal enclave. Congress has not provided the same in the instant matter.[4]

> B. The Assimilative Crimes Act Does Not Otherwise Permit the State Charges Which Occurred on a Federal Enclave to be Heard Before a State Court

Congress enacted the so-called "federal enclave laws" which are a group of statutes that permits the federal courts to serve as a forum for the prosecution of certain crimes when they occur within a federal enclave. 18 U.S.C. § 7. Additionally, the Assimilative Crimes Act was enacted which permits a federal court to borrow a state's criminal laws where there is no federal law proscribing an offense committed on an enclave within that state; the Act permits the federal court to serve as a forum for the prosecution of state charges. See 18 U.S.C. § 13. The Assimilative Crimes Act does <u>NOT</u> permit the state courts to oversee prosecution of state charges which occur on federal lands.

The United States Supreme Court has grappled with this on *numerous* occasions. The U.S. Supreme Court made such distinctions on applicability in *Lewis v. United States*, 523 U.S. 155, 1998. The Court stated: "The ACA applies state law to a defendant's acts or omissions that

---

[4] Furthermore, common law causes of action that gained recognition after the date of cession have no application within the enclave.

are "not made punishable by any enactment of Congress." 18 U.S.C. § 13(a) (emphasis added). The basic question before us concerns the meaning of the italicized phrase. These words say that the ACA does not assimilate a state statute if the defendant's "act" or "omission" is punished by "any [federal] enactment." If the words are taken literally, Louisiana's law could not possibly apply to Lewis, for there are several federal "enactments" that make Lewis' acts punishable, for example, the federal (second degree) murder statute, 18 U.S.C. § 1111, and the federal assault law, § 113. We agree with the Government, however, that this is not a sensible interpretation of this language, since a literal reading of the words "any enactment" would dramatically separate the statute from its intended purpose. The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves. See *Williams v. United States*, 327 U.S. 711, 718-719, 90 L. Ed. 962, 66 S. Ct. 778 (1946) (ACA exists "to fill in gaps" in federal law where Congress has not "defined the missing offenses"); *United States v. Sharpnack*, 355 U.S. 286, 289, 2 L. Ed. 2d 282, 78 S. Ct. 291 (1958) (ACA represents congressional decision of "adopting for otherwise undefined offenses the policy of general conformity to local law"); *United States v. Press Publishing Co.*, 219 U.S. 1, 9-10, 55 L. Ed. 65, 31 S. Ct. 212 (1911) (state laws apply to crimes "which were not previously provided for by a law of the United States"); *Franklin v. United States*, 216 U.S. 559, 568, 54 L. Ed. 615, 30 S. Ct. 434 (1910) (assimilation occurs where state laws "not displaced by specific laws enacted by Congress")." See *Lewis v. United States*, 523 U.S. 155, 160, 1998.

*Lewis* goes on to further note: "In our view, the ACA's language and its gap-filling purpose taken together indicate that a court must first ask the question that the ACA's language requires: Is the defendant's "act or omission . . . made punishable by any enactment of Congress." 18 U.S.C. § 13(a) (emphasis added). If the answer to this question is "no," that

7

will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say because its application would interfere with the achievement of a federal policy, see *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 389-390, 88 L. Ed. 814, 64 S. Ct. 622 (1944), because the state law would effectively rewrite an offense definition that Congress carefully considered, see *Williams*, supra, 327 U.S. 711 at 718, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue, see *Id.*, at 724 (no assimilation where Congress has "covered the field with uniform federal legislation"). See also *Franklin*, 216 U.S. at 568 (assimilation proper only where state laws "not displaced by specific laws enacted by Congress"). There are too many different state and federal criminal laws, applicable in too many different kinds of circumstances, bearing too many different relations to other laws, to common law tradition, and to each other, for a touchstone to provide an automatic general answer to this second question. Still, it seems fairly obvious that the Act will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior -- where, for example, differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment. See, e.g., *United States v. Adams*, 502 F. Supp. 21, 25 (SD Fla. 1980) (misdemeanor/felony difference did not justify assimilation). The Act's basic purpose makes it similarly clear that assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create. *Williams*, supra, 327 U.S. 711 at 717-718 (nothing in the history or language of the ACA to indicate that once Congress has "defined a penal

offense, it has authorized such definition to be enlarged" by state law). Hence, ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime." *Lewis* at 164-165.[5]

Here, we have virtually identical federal and state statutes in the instant matter which are meant to cover the same "acts" or "behaviors" of the alleged, and thus, no "gap" to fill whatsoever.

a. State and Federal Wiretapping Charges are Virtually Identical

Maryland Courts & Judicial Proceedings, Code Ann., § 10-402 reads: "(a) Except as otherwise specifically provided in this subtitle it is unlawful for any person to: (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or (3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle." *Id.*

Meanwhile, 18 U.S.C. 2511 reads: "(1) Except as otherwise specifically provided in this chapter [18 USCS §§ 2510 et seq.] any person who - (a) intentionally intercepts, endeavors to

---

[5] In *Lewis*, the crimes at issue – Louisiana's murder statute La. Rev. Stat. Ann. Section 14.30 and federal murder statute – 18 U.S.C. 1111 did not assimilate.

9

intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when - (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or (iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States; (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or (e) (i) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(a)(ii), (b)–(c), (e), 2516, and 2518 of this chapter [18 USCS §§ 2511(2)(a)(ii), (b)–(c), (e), 2516, and 2518],

(ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation,

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)." *Id.*

    b. State and Federal Disorderly Conduct Charges are Virtually Identical

Maryland Criminal Law, Code Ann., § 10-201(c) reads: "(c) (1) A person may not willfully and without lawful purpose obstruct or hinder the free passage of another in a public place or on a public conveyance. (2) A person may not willfully act in a disorderly manner that disturbs the public peace. (3) A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace. (4) A person who enters the land or premises of another, whether an owner or lessee, or a beach adjacent to residential riparian property, may not willfully: (i) disturb the peace of persons on the land, premises, or beach by making an unreasonably loud noise; or (ii) act in a disorderly manner. (5) A person from any location may not, by making an unreasonably loud noise, willfully disturb the peace of another: (i) on the other's land or premises; (ii) in a public place; or (iii) on a public conveyance. (6) In Worcester County, a person may not build a bonfire or allow a bonfire to burn on a beach or other property between 1 a.m. and 5 a.m." *Id.*

Meanwhile, 18 U.S.C. 1752 reads: "a) Whoever - (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so; (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions,

11

engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or (4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so, shall be punished as provided in subsection (b). (5) knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds; or attempts or conspires to do so, shall be punished as provided in subsection (b)." *Id.*

    c. Further Evidence of Federal Rules and Regulations Mandated for Alleged Conduct on VA Property

In further support of Mr. Soper's argument, there is a specific statute within the Code of Federal Regulations which controls the security and law enforcement at VA facilities codified in 38 C.F.R. Section 1.218.

38 C.F.R. Section 1.218. (b) reads: "Schedule of offenses and penalties. Conduct in violation of the rules and regulations set forth in paragraph (a) of this section subjects an offender to arrest and removal from the premises. Whomever shall be found guilty of violating these rules and regulations while on any property under the charge and control of VA is subject to a fine as stated in the schedule set forth herein or, if appropriate, the payment of fixed sum in lieu of appearance (forfeiture of collateral) as may be provided for in rules of the United States District Court. *Violations included in the schedule of offenses and penalties may also subject an*

*offender to a term of imprisonment of not more than six months, as may be determined appropriate by a magistrate or judge of the United States District Court:* (11) Disorderly conduct which creates loud, boisterous, and unusual noise, or which obstructs the normal use of entrances, exits, foyers, offices, corridors, elevators, and stairways or which tends to impede or prevent the normal operation of a service or operation of the facility, $ 250. (23) Unauthorized photography on premises, $ 50." *Id.* This verifies yet another federal statute that solidifies that any alleged offenses of Mr. Soper on the date in question are only proper before the United States District Court under federal jurisdiction.[6]

Additionally, the Department of Veterans Affairs issued VHA Directive 1078 on November 29th, 2021, titled: "Privacy of Persons Regarding Photographs, Digital Images and Video or Audio Recordings." While the "Reason for Issue" reads, "This Veterans Health Administration (VHA) directive mandates the parameters under which members of the VHA workforce may produce and use photographs, digital images and video or audio recordings of all persons and reinforces existing regulations covering these activities;" what is particularly important to the issue at hand is what the "Purpose" of the VHA Directive, which reads: "1. PURPOSE - This Veterans Health Administration (VHA) directive maintains VHA policy by which members of the VHA workforce may produce and use photographs, digital images and video or audio recordings of all persons, and reinforces existing regulations covering these activities. AUTHORITY: 38 U.S.C. § 7301(b); 38 C.F.R. § 1.218; 41 C.F.R. § 102 - 74.420. *NOTE: This policy specifically does not address Veterans, patients or their family members from recording providers or employees without their permission as no federal statute or regulation prohibits such action.*"

---

[6] See also *United States v. Biear*, 75 Fed. Appx. 855, 2003 and *United States v. Fentress*, 241 F. Supp. 2d 526, 2003; holding 38 C.F.R. 1.218, a person's disorderly conduct within a VA facility proper before a U.S. District Court.

13

The Directive then goes on to unequivocally state how to enforce such issues contained within the Directive. It reads: d. <u>Law Enforcement Purpose.</u> A law enforcement purpose is an effort to enforce Federal laws (under authority provided by 38 U.S.C. § 902 and the rules prescribed by the Secretary of VA in 38 C.F.R. § 1.218(a) and (b)). Photographing, imaging and recording will only be conducted consistent with 18 U.S.C. § 1801, which addresses certain instances of videotaping an individual without consent; or 18 U.S.C. § 2511, which prohibits the unauthorized interception, disclosure and use of wire oral or electronic communication, as well as VA regulations. For example, security surveillance television (SSTV) with cameras or recording devices are often installed in a VA canteen or other retail operation for security monitoring in order to identify criminal activity." *Id.*[7]

The federal agency that issued this Directive recognized that a patient recording in any fashion their medical appointments is: 1) expressly permitted, 2) not wiretapping as set forth in 18 U.S.C. 2511, and 3) is otherwise expressly subject to federal statutes 38 U.S.C. § 7301(b); 18 U.S.C. § 1801; 18 U.S.C. § 2511; 38 C.F.R. § 1.218; or 41 C.F.R. § 102 - 74.420.

Thus, in the simplest of terms, Mr. Soper's alleged conduct may be punishable by a proper federal law and there is no "gap" under the Assimilative Crimes Act in which to apply state law.

*CONCLUSION*

For the reasons as stated supra, the State's Attorney for Cecil County, Maryland, and respectfully, this Honorable Court, do not have jurisdiction over the instant matter. Only the proper United States Attorney and United State District Court would have proper authority.

---

[7] Said VHA Directive 1078 in relevant part is attached hereto as Exhibit D.

Therefore, undersigned counsel respectfully asks the Court to GRANT Mr. Soper's Motion to Dismiss.

Respectfully Submitted,

_____
Tyler J. Nowicki, Esq.
Nowicki & Associates, P.A.
727 N. Hickory Ave.
Bel Air, MD 21014
P: 410-879-0026
F: 410-893-8199
tnowicki@nowickifirm.com
Attorneys for Defendant
CPF ID:1012150311

CERTIFICATE OF SERVICE

I, HEREBY CERTIFY, that on this _____ day of _____, 2023, a copy of the foregoing Motion to Dismiss was e-filed via MDEC and issued via U.S. Mail to the Office of State's Attorney for Cecil County, Robert E. Sentman, Esq. 129 E. Main Street, #3, Elkton, MD 21921.

_____

Tyler J. Nowicki, Esquire

| | | |
|---|---|---|
| STATE OF MARYLAND | * | IN THE |
| v. | * | CIRCUIT COURT |
| KEVIN A. SOPER | * | FOR |
| Defendant | * | CECIL COUNTY |
| | * | CASE NUMBER: C-07-CR-23-000258 |

\* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

Upon consideration of Defendant's Motion to Dismiss in the above referenced matter, it is on this _____ day of _____, 2023, hereby:

ORDERED that Defendant's request be GRANTED, and the above referenced case number be DISMISSED.

_____
Judge, Circuit Court for Cecil County