| STATE OF MARYLAND | * | IN THE |
| --- | --- | --- |
| v. | * | CIRCUIT COURT |
| KEVIN A. SOPER | * | FOR |
| Defendant | * | CECIL COUNTY |
| | * | CASE NUMBER: C-07-CR-23-000414 |

* * * * * * * * * * * * *

## MOTION TO DISMISS

Now comes Defendant, Kevin A. Soper, by and through his attorneys, Tyler J. Nowicki, Esq. and Nowicki & Associates, P.A., hereby files this Motion to Dismiss pursuant to Maryland Rule 4-252(a)(3) and (d) and in support thereof states:

### I. *PREAMBLE*

The indictment against Mr. Soper should be dismissed, because the incidents for which Mr. Soper is charged occurring on or about February 15th – 22nd, 2023 at the Perry Point Veteran's Affairs Medical Center (hereinafter "VA") located at 361 Boiler House Road, Perry Point, MD 21902, Building 361, occurred on land which is under the exclusive jurisdiction of the United States Government; thus, the charging document fails to show jurisdiction in this Honorable Court, and Mr. Soper is not subject to the State of Maryland charges now before this Honorable Court as prosecuted by the Office of the State's Attorney for Cecil County, Maryland. Additionally, these charges and indictment stem from the improper search and seizure of media work product.

### II. *STATEMENT OF FACTS*

1

On the incident dates in question Mr. Soper was following up with the VA staff to address concerns regarding his medical appointments. It is alleged that Mr. Soper then video and/or audio taped portions of his interaction with VA employees while on VA property on said incident dates and displayed or otherwise caused to be distributed to his YouTube page titled "The Angry Vet." The Angry Vet boasts over 34,000 subscribers, and videos (194 videos to date) have anywhere from 2,500 to 450,000 views, with total views of the YouTube channel reaching in excess of 4,200,000. Department of Veterans Affairs Police, Officer Dale A. Money wrote two (2) separate reports, one dated March 27th, 2023, and the other dated April 5th, 2023, after Officer Money and/or members of the Cecil County Sheriff's Department confiscated a cellular phone based upon the exact same issues and reasoning on or about February 15th, 2023, and searched said property believed to be the property of Mr. Soper, subject to a search and seizure warrant. At the conclusion of the March 27th, 2023, report it reads: "I contacted ASA Robert Sentman and asked if the State's Attorney's Office would be interested in pursuing the case. He said they would and provide his office a copy of the report and videos." Further, Officer Money's report dated April 4th, 2023, at the conclusion states: "I contacted the Assistant United States Attorney (AUSA) and asked if they were interested in pursuing this case. AUSA replied in an email that since SOPER has a similar case pending in state court for me to file charges in Cecil County."[1] From these incident dates Mr. Soper was indicted and now faces five (5) charges as codified by Maryland Courts & Judicial Proceedings, Code Ann., § 10-402.

### III. *ARGUMENT*

A. The Incident Occurred on a Federal Enclave

This Honorable Court lacks jurisdiction to hear this matter as presently charged based

---

[1] Find attached hereto as collective Exhibit A said Incident Reports from the Department of Veterans Affairs Police dated March 27th, 2023, and April 5th, 2023.

2

upon the Federal Enclave status, and thus exclusive federal jurisdiction, of the land and property of the incident at all times, namely the Veteran's Administration (VA) land and property located at Perry Point, MD. The VA has a rich and colorful history. Around 1680, Lord Baltimore made grant of 32,000 acres of land to his cousin Geroge Talbot, which encompassed "Susquehanna Point" or, Perry Point, MD. John Bateman acquired the land in 1658 by a patent from Lord Baltimore. In 1710, Captain Richard Perry acquired the land. In 1729, Phillip Thomas became owner of the Property, whose family owned the land until it's sale to John Stump in 1800. The Stump family owned the property until 1861, when during the Civil War, the United States Government took over the property. In 1918, despite the property being already taken over by the United States Government, the United States Government "purchased" the land consisting of 516 acres at issue from the Stump family for $150,000.00. By an act of Congress, Perry Point was "turned over" to the U.S. Public Health Service on March 3rd, 1919. On or about May 1st, 1922, the United States Veterans Bureau "took over" Perry Point, MD. When the United States Veterans Bureau was created in 1922, Perry Point was placed under its administration on May 1, 1922. Thereafter, the Veterans Administration was established by the Executive Order of President Herbert Hoover in 1930. The Veteran's Administration was then elevated to cabinet level Executive Department by President Ronald Reagan in October 19881 and the Veterans Administration was renamed the Department of Veterans Affairs, and has continued to be better known as the "VA" to present date.[2]

Thus, it is absolute that the land and property at issue has never, since 1918 (arguably since 1861), been transferred out of Federal control. The property, by this act of Congress, is

---

[2] Find attached hereto as Exhibit B the VA's produced "The History of the Perry Point Peninsula: From Early Settlers to VA Health Care for Veterans.

to be forever held under The Enclave Clause, found at Article I, Section 8, Clause 17 of the United States Constitution, which grants the United States exclusive legislative jurisdiction over any parcel of land ceded by a state to the federal government "for the Erection of Forts, Magazines, Arsenals, Dock, Yards, and other Needful Buildings." *Id.* The United States Supreme Court has interpreted this clause to mean that state laws passed after the date upon which the parcel was ceded by the State to the Federal Government, do not apply within the enclave, unless the state specifically retained jurisdiction over the subject matter at issue. After exclusive jurisdiction over lands within a state has been ceded to the United States, Congress alone has the power to punish crimes committed within the ceded territory. *Battle v. United States*, 209 U.S. 36 (1908); *Johnson v. Yellow Cab Co.*, 321 U.S. 383 (1944); *Bowen v. Johnston*, 306 U.S. 19 (1939).

The fact the VA is a federal enclave subject to exclusive federal jurisdiction was unequivocally verified by the Maryland Court of Appeals in *Royer v. Board of Election Supervisors*, 231 Md. 561 (1963). In *Royer*, the matter was an appeal from an order dismissing a petition for appeal praying an order requiring the Board of Election Supervisors of Cecil County to register the petitioners as qualified voters in Cecil County. The salient facts were stipulated. The petitioners were civilian employees of the United States Government at the Perry Point Veterans' Hospital, located within the geographical limits of Cecil County, and reside and work there, having no other residence in the County. The Court stated: "The tract known as Perry Point, consisting of about five hundred acres of land, was purchased by the United States Government in 1918 and used to manufacture chemicals for war purposes. A manufacturing plant was erected thereon and a number of workers' houses and facilities. It now contains, in

addition, hospitals for the care and treatment of disabled veterans, operated by the Veterans' Administration. The tract was purchased in strict accordance with the provisions of the Federal Constitution, for the purposes mentioned in Article I, sec. 8, clause 17, and with the consent of the State of Maryland. Exclusive jurisdiction was ceded by the State, in accordance with the provisions of Chapter 743 of the Acts of 1906, now codified as Code (1957), Art. 96, secs. 31, 36 and 37. The *only* reservation by the State was the right to serve civil and criminal process upon persons found there. The state expressly agreed that the land ceded should be exempt "from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State." (*Emphasis Added*) *Id.* at 563. [3]

After establishing that the VA is a federal enclave, the next question that must be answered is: which state laws are preempted? The general rule is that: (1) a state law that was enacted before the cession continues to apply unless Congress states otherwise; and (2) state law that was enacted after the creation of the enclave does not apply to the enclave.

It was not until 1956 that the Maryland General Assembly passed the Maryland Wiretapping Act to establish such applicable statutory guidelines. Wiretapping Act, ch.116, 1956 Md. Laws 294 (repealed and recodified in 1973). What is now codified as Maryland Courts & Judicial Proceedings, Code Ann., § 10-402 – the charge Mr. Soper currently faces, began as An. Code 1957, art. 35, §§ 93, 99; 1973. It was during the Maryland General Assembly's 1973 Special Session that the Courts & Judicial Proceedings Article was enacted. Act of August 22, 1973, ch. 2, 1973 Md. Laws Spec. Sess. 4. Thus, the state law at issue was enacted after the creation of the enclave and does not apply to the enclave.

There are three (3) notable exceptions to this general rule. First, state law is not

---

[3] *Royer* case attached hereto in its entirety as Exhibit C.

preempted if the state had, at the time of cession, expressly reserved the right to legislate over the matters at issue. As noted in *Royer*, the state did not reserve the right to legislate over the matter at issue, criminal charges. Second, minor regulatory changes to state programs that existed at the time of cession are not preempted "provided the basic state law authorizing such control has been in effect" since the time of cession. That is not the case in the instant matter. Finally, federal enclaves are not shielded from state law if Congress provides "clear and unambiguous" authorization for such state regulation over its federal enclave. Congress has not provided the same in the instant matter.[4]

    B. The Assimilative Crimes Act Does Not Otherwise Permit the State Charges Which Occurred on a Federal Enclave to be Heard Before a State Court

Congress enacted the so-called "federal enclave laws" which are a group of statutes that permits the federal courts to serve as a forum for the prosecution of certain crimes when they occur within a federal enclave. 18 U.S.C. § 7. Additionally, the Assimilative Crimes Act was enacted which permits a federal court to borrow a state's criminal laws where there is no federal law proscribing an offense committed on an enclave within that state; the Act permits the federal court to serve as a forum for the prosecution of state charges. See 18 U.S.C. § 13. The Assimilative Crimes Act does <u>NOT</u> permit the state courts to oversee prosecution of state charges which occur on federal lands.

The United States Supreme Court has grappled with this on *numerous* occasions. The U.S. Supreme Court made such distinctions on applicability in *Lewis v. United States*, 523 U.S.

---

[4] Furthermore, common law causes of action that gained recognition after the date of cession have no application within the enclave.

155, 1998. The Court stated: "The ACA applies state law to a defendant's acts or omissions that are "not made punishable by any enactment of Congress." 18 U.S.C. § 13(a) (emphasis added). The basic question before us concerns the meaning of the italicized phrase. These words say that the ACA does not assimilate a state statute if the defendant's "act" or "omission" is punished by "any [federal] enactment." If the words are taken literally, Louisiana's law could not possibly apply to Lewis, for there are several federal "enactments" that make Lewis' acts punishable, for example, the federal (second degree) murder statute, 18 U.S.C. § 1111, and the federal assault law, § 113. We agree with the Government, however, that this is not a sensible interpretation of this language, since a literal reading of the words "any enactment" would dramatically separate the statute from its intended purpose. The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves. See *Williams v. United States*, 327 U.S. 711, 718-719, 90 L. Ed. 962, 66 S. Ct. 778 (1946) (ACA exists "to fill in gaps" in federal law where Congress has not "defined the missing offenses"); *United States v. Sharpnack*, 355 U.S. 286, 289, 2 L. Ed. 2d 282, 78 S. Ct. 291 (1958) (ACA represents congressional decision of "adopting for otherwise undefined offenses the policy of general conformity to local law"); *United States v. Press Publishing Co.*, 219 U.S. 1, 9-10, 55 L. Ed. 65, 31 S. Ct. 212 (1911) (state laws apply to crimes "which were not previously provided for by a law of the United States"); *Franklin v. United States*, 216 U.S. 559, 568, 54 L. Ed. 615, 30 S. Ct. 434 (1910) (assimilation occurs where state laws "not displaced by specific laws enacted by Congress")." See *Lewis v. United States*, 523 U.S. 155, 160, 1998.

*Lewis* goes on to further note: "In our view, the ACA's language and its gap-filling purpose taken together indicate that a court must first ask the question that the ACA's language requires: Is the defendant's "act or omission . . . made punishable by any enactment

7

of Congress." 18 U.S.C. § 13(a) (emphasis added). If the answer to this question is "no," that will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say because its application would interfere with the achievement of a federal policy, see *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 389-390, 88 L. Ed. 814, 64 S. Ct. 622 (1944), because the state law would effectively rewrite an offense definition that Congress carefully considered, see *Williams*, supra, 327 U.S. 711 at 718, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue, see *Id.*, at 724 (no assimilation where Congress has "covered the field with uniform federal legislation"). See also *Franklin*, 216 U.S. at 568 (assimilation proper only where state laws "not displaced by specific laws enacted by Congress"). There are too many different state and federal criminal laws, applicable in too many different kinds of circumstances, bearing too many different relations to other laws, to common law tradition, and to each other, for a touchstone to provide an automatic general answer to this second question. Still, it seems fairly obvious that the Act will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior -- where, for example, differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment. See, e.g., *United States v. Adams*, 502 F. Supp. 21, 25 (SD Fla. 1980) (misdemeanor/felony difference did not justify assimilation). The Act's basic purpose makes it similarly clear that assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create. *Williams*, supra, 327 U.S. 711 at 717-718 (nothing

in the history or language of the ACA to indicate that once Congress has "defined a penal offense, it has authorized such definition to be enlarged" by state law). Hence, ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime." *Lewis* at 164-165.[5]

Here, we have virtually identical federal and state statutes in the instant matter which are meant to cover the same "acts" or "behaviors" of the alleged, and thus, no "gap" to fill whatsoever.

a. State and Federal Wiretapping Charges are Virtually Identical

Maryland Courts & Judicial Proceedings, Code Ann., § 10-402 reads: "(a) Except as otherwise specifically provided in this subtitle it is unlawful for any person to: (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or (3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle." *Id.*

Meanwhile, 18 U.S.C. 2511 reads: "(1) Except as otherwise specifically provided in this

---

[5] In *Lewis*, the crimes at issue – Louisiana's murder statute La. Rev. Stat. Ann. Section 14.30 and federal murder statute – 18 U.S.C. 1111 did not assimilate.

chapter [18 USCS §§ 2510 et seq.] any person who - (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when - (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or (iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States; (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or (e) (i) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(a)(ii), (b)–(c),

(e), 2516, and 2518 of this chapter [18 USCS §§ 2511(2)(a)(ii), (b)–(c), (e), 2516, and 2518], (ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation, shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)." *Id.*

    b. Further Evidence of Federal Rules and Regulations Mandated for Alleged Conduct on VA Property

In further support of Mr. Soper's argument, there is a specific statute within the Code of Federal Regulations which controls the security and law enforcement at VA facilities codified in 38 C.F.R. Section 1.218.

38 C.F.R. Section 1.218. (b) reads: "Schedule of offenses and penalties. Conduct in violation of the rules and regulations set forth in paragraph (a) of this section subjects an offender to arrest and removal from the premises. Whomever shall be found guilty of violating these rules and regulations while on any property under the charge and control of VA is subject to a fine as stated in the schedule set forth herein or, if appropriate, the payment of fixed sum in lieu of appearance (forfeiture of collateral) as may be provided for in rules of the United States District Court. *Violations included in the schedule of offenses and penalties may also subject an offender to a term of imprisonment of not more than six months, as may be determined appropriate by a magistrate or judge of the United States District Court:* (23) Unauthorized photography on premises, $ 50." *Id.* This verifies yet another federal statute that solidifies that

any alleged offenses of Mr. Soper on the date in question are only proper before the United States District Court under federal jurisdiction.

Additionally, the Department of Veterans Affairs issued VHA Directive 1078 on November 29th, 2021, titled: "Privacy of Persons Regarding Photographs, Digital Images and Video or Audio Recordings." While the "Reason for Issue" reads, "This Veterans Health Administration (VHA) directive mandates the parameters under which members of the VHA workforce may produce and use photographs, digital images and video or audio recordings of all persons and reinforces existing regulations covering these activities;" what is particularly important to the issue at hand is what the "Purpose" of the VHA Directive, which reads: "1. PURPOSE - This Veterans Health Administration (VHA) directive maintains VHA policy by which members of the VHA workforce may produce and use photographs, digital images and video or audio recordings of all persons, and reinforces existing regulations covering these activities. AUTHORITY: 38 U.S.C. § 7301(b); 38 C.F.R. § 1.218; 41 C.F.R. § 102 - 74.420. *NOTE: This policy specifically does not address Veterans, patients or their family members from recording providers or employees without their permission as no federal statute or regulation prohibits such action.*"

The Directive then goes on to unequivocally state how to enforce such issues contained within the Directive. It reads: d. <u>Law Enforcement Purpose.</u> A law enforcement purpose is an effort to enforce Federal laws (under authority provided by 38 U.S.C. § 902 and the rules prescribed by the Secretary of VA in 38 C.F.R. § 1.218(a) and (b)). Photographing, imaging and recording will only be conducted consistent with 18 U.S.C. § 1801, which addresses certain instances of videotaping an individual without consent; or 18 U.S.C. § 2511, which prohibits the unauthorized interception, disclosure and use of wire oral or electronic

communication, as well as VA regulations. For example, security surveillance television (SSTV) with cameras or recording devices are often installed in a VA canteen or other retail operation for security monitoring in order to identify criminal activity." *Id.*[6]

The federal agency that issued this Directive recognized that a patient recording in any fashion their medical appointments is: 1) expressly permitted, 2) not wiretapping as set forth in 18 U.S.C. 2511, and 3) is otherwise expressly subject to federal statutes 38 U.S.C. § 7301(b); 18 U.S.C. § 1801; 18 U.S.C. § 2511; 38 C.F.R. § 1.218; or 41 C.F.R. § 102 - 74.420.

Thus, in the simplest of terms, Mr. Soper's alleged conduct may be punishable by a proper federal law and there is no "gap" under the Assimilative Crimes Act in which to apply state law.

### C. The Evidence Against Mr. Soper Stems From Improper Execution of Search and Seizure Warrant of Media Work Product

The Constitution of the United States via the First, Fourth and Fourteenth Amendment guarantee not only the right of "The People" to be free in their expression of speech but also to be free of unreasonable, warrantless searches and equal protection of those rights through the restraint of the government. Furthermore, certain federal statutes make unlawful the seizure of work products and documentary materials in the possession of media by government employees, even incident to an arrest or warrant.

42 U.S.C. 2000(a)(a) Searches and Seizures by Government Officers and Employees in Connection with Investigation or Prosecution of Criminal Offenses, reads: "a) Work Product Materials. Notwithstanding any other law, it shall be unlawful for a government officer or

---
[6] Said VHA Directive 1078 in relevant part is attached hereto as Exhibit D.

13

employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if - (1) there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate: Provided, however, That a government officer or employee may not search for or seize such materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein (but such a search or seizure may be conducted under the provisions of this paragraph if the offense consists of the receipt, possession, or communication of information relating to the national defense, classified information, or restricted data under the provisions of section 793, 794, 797, or 798 of title 18, United States Code, or section 224, 225, or 227 of the Atomic Energy Act of 1954 (42 U.S.C. 2274, 2275, 2277), or section 4 of the Subversive Activities Control Act of 1950 (50 U.S.C. 783), or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code). b) Other Documents. Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize documentary materials, other than work product materials, possessed by a person in connection with a purpose to disseminate to the public a

newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if - (1) there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate: Provided, however, That a government officer or employee may not search for or seize such materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein (but such a search or seizure may be conducted under the provisions of this paragraph if the offense consists of the receipt, possession, or communication of information relating to the national defense, classified information, or restricted data under the provisions of section 793, 794, 797, or 798 of title 18, United States Code, or section 224, 225, or 227 of the Atomic Energy Act of 1954 (42 U.S.C. 2274, 2275, 2277), or section 4 of the Subversive Activities Control Act of 1950 (50 U.S.C. 783), or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code). *Id.*

As set forth in 42 U.S. Code § 2000(a)(a) – 7 – Definitions (a) "Documentary materials," as used in this chapter, means materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magnetically or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has

been used as, the means of committing a criminal offense. (b) "Work product materials," as used in this chapter, means materials, other than contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used, as the means of committing a criminal offense, and - (1) in anticipation of communicating such materials to the public, are prepared, produced, authored, or created, whether by the person in possession of the materials or by any other person; (2) are possessed for the purposes of communicating such materials to the public; and (3) include mental impressions, conclusions, opinions, or theories of the person who prepared, produced, authored, or created such material.

In the exceptions to The Privacy Protection Act (The PPA), there are no circumstances contained therein that allowed for the lawful or otherwise proper seizure of what the officer's believed was Mr. Soper's cellular phone given it unequivocally being used for "work product" or other media/documentary purposes on the incident date(s). Prior to any contact or interaction with law enforcement, Mr. Soper gave the cellular phone that was previously in his possession to his wife with him on that date; thus, Mr. Soper's wife was the *only* person in possession of the phone from the onset of any police contact or interaction. At the initiation of the arrest, a VA Police Officer asks Mr. Soper if he was aware that he had a warrant for his arrest. Mr. Soper responds asking if the warrant was from the Cecil County Sheriff's Department to which the VA Officer replied, "no, no this is from us," indicating it was an arrest warrant issued from a federal government agency. Mr. Soper expressly asked Lt. Farrer if he had a warrant for the phone, to this direct inquiry, Lt. Farrer responded, "No I do not." Mr. Soper then asks if the VA Police were going to deny his medical appointment, as he was there that day by appointment for medical care. Then the VA Officer, turning his attention to the

defendant's wife who was holding the phone to, "make sure you get my best side. Ok? Ok?" The VA Officer goes on to miscommunicate The Assimilated Crimes Act (ACA), asserting the Mr. Soper was "being charged with a federal crime of video or audio taping without consent and later advises and admitted to Mr. Soper that, "we watch you online." Thus, the VA Officer was fully aware that the phone was being used as "work product" or for other media/documentary purposes.

By this time, Lt. Farrar then directed his attention to Mrs. Soper as Mr. Soper was being handcuffed. Then, Lt. Farrar, during the arrest, asked, "you got your phone" and Mr. Soper's wife advised that she had it. Mr. Soper immediately protested Lt. Farrar's request, asking again for a warrant. Lt. Farrar advised Mr. Soper's wife that, "we have a warrant for his arrest and his phone is part of evidence that he recorded." Mr. Soper asks to see a copy of the warrant specific to the phone. Lt. Farrar, ignoring Mr. Soper, again asks Mr. Soper's wife for the phone. Mr. Soper's wife asks specifically to see a copy of the warrant, and if the warrant specifically includes the phone. Lt. Farrar does not produce a copy of the warrant, going on to state in deflection of the request that "he [Mr. Soper] is being charged with wiretapping and the evidence used for that is the phone. It is evidence, but I don't want you to get in any kind of trouble by impeding an investigation." Mr. Soper's wife responds, "I would like to call his lawyer first," to which Lt. Farrer responds, "by all means you can call his lawyer but I'm asking you can I have the phone." Mr. Soper's wife responds "no" and goes on to say she would like to call his lawyer. Lt. Farrar then reaches for his handcuffs and advises her, "you are impeding an investigation." Mr. Soper's wife ends the video and dials counsel. After Mr. Soper's wife called his lawyer, she advised Lt. Farrar that the lawyer advised her to turn the phone over "under threat of arrest" and she did. Lt. Farrar then seizes the phone. This encounter is

available on YouTube.

Aside from the blatant misinformation by the VA Police during the incident over what Mr. Soper was being charged with as a "federal crime," where and under what court jurisdiction the warrant originated, the workings of the ACA and the lawful boundaries of the warrant for the defendant's arrest, the VA Police also had no lawful reason to take custody and seize the phone and in fact The Privacy Protection Act makes the confiscation of the phone unlawful by statute.[7] The PPA states, "it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce. It is undeniable that the phone is not only a "work product" but also logically contains "documentary materials" as defined by the statute and defined therein.

What makes such a seizure even more egregious, is that the VA Police _knew_ that Mr. Soper is clearly a "news source in interstate commerce" as displayed by their prior admission that they "watch him on YouTube." There was no mention of a phone in the warrant, only to arrest the defendant was authorized. There was, in fact, plenty of time for either the VA Police to take proper measures to lawfully secure Mr. Soper's phone and its contents long before Mr. Soper was arrested. Thus, the search and seizure of the phone was not lawful or otherwise proper.

---

[7] Although the VA Police Officers admission that Mr. Soper was being charged with a "federal crime" further verifies Mr. Soper's argument contained herein.

*CONCLUSION*

For the reasons as stated supra, the State's Attorney for Cecil County, Maryland, and respectfully, this Honorable Court, do not have jurisdiction over the instant matter. Only the proper United States Attorney and United State District Court would have proper authority. Further, all evidence was improperly obtained as it was protected media work product. Therefore, undersigned counsel respectfully asks the Court to GRANT Mr. Soper's Motion to Dismiss.

Respectfully Submitted,

Tyler J. Nowicki, Esq.
Nowicki & Associates, P.A.
727 N. Hickory Ave.
Bel Air, MD 21014
P: 410-879-0026
F: 410-893-8199
tnowicki@nowickifirm.com
Attorneys for Defendant
CPF ID:1012150311

CERTIFICATE OF SERVICE

I, HEREBY CERTIFY, that on this _____ day of _____, 2023, a copy of the foregoing Motion to Dismiss was e-filed via MDEC and issued via U.S. Mail to the Office of State's Attorney for Cecil County, Robert E. Sentman, Esq. 129 E. Main Street, #3, Elkton, MD 21921.

Tyler J. Nowicki, Esquire

| | | |
|---|---|---|
| STATE OF MARYLAND | * | IN THE |
| v. | * | CIRCUIT COURT |
| KEVIN A. SOPER | * | FOR |
| Defendant | * | CECIL COUNTY |
| | * | CASE NUMBER: C-07-CR-23-000258 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

Upon consideration of Defendant's Motion to Dismiss in the above referenced matter, it is on this _____ day of _____, 2023, hereby:

ORDERED that Defendant's request be GRANTED, and the above referenced case number be DISMISSED.

_____
Judge, Circuit Court for Cecil County